**REED ELSEVIER, INC., et al., Plaintiffs,**

v.

**THELAW.NET CORPORATION, Defendant.**

No. C–3–01–116.

United States District Court, S.D. Ohio, Western Division.

March 24, 2003.

Charles Joseph Faruki, Donald E. Burton, Faruki Ireland & Cox PLL, Dayton, OH, Carla C. Calcagno, Howrey Simon Arnold & White LLP, Washington, DC, Thomas Robert Kraemer, Faruki Gilliam & Cox, Dayton, OH, Trina Ann Longo, Howrey Simon Arnold & White LLP,

Washington, DC, J. Paul Williamson, Fulbright & Jaworski LLP, Washington, DC, for plaintiffs.

John Francis Haviland, Charles Franklin Shane, Bieser, Greer & Landis, Dayton, OH, Louis P. Svendsen, Cary, IL, for defendant.

## DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT (DOC. # 48); CONFERENCE CALL SET TO DETERMINE VIABILITY OF JUNE 2, 2003, TRIAL DATE

RICE, Chief Judge.

In their Second Amended Complaint (Doc. # 47), the Plaintiffs herein, Reed Elsevier, Inc., Reed Elsevier Properties, Inc., Matthew Bender & Co. and Matthew Bender Properties, Inc. (collectively, "Plaintiffs"), set forth ten claims for relief against the Defendant, TheLaw.net Corporation ("Defendant"), to wit: (1) trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(1) & 1125(a)(1)(A) (First Claim for Relief); (2) false advertising and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Second Claim for Relief); (3) trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c) (Third Claim for Relief); (4) trademark infringement under Ohio Rev.Code § 1329.65 (Fourth Claim for Relief); (5) deceptive trade practices under Ohio Rev. Code § 4165.02 (Fifth Claim for Relief); (6) trademark and trade name infringement under the common law of Ohio (Sixth Claim for Relief); (7) unfair competition under the common law of Ohio (Seventh Claim for Relief); (8) trademark dilution under the common law of Ohio (Eighth Claim for Relief); (9) tortious interference with a business relationship under the common law of Ohio (Ninth Claim for Relief); and (10) breach of contract under the common law of Ohio (Tenth Claim for Relief).

Pending before the Court is the Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. # s 42 & 48),[1] which is directed toward all of the Plaintiffs' claims except their Tenth Claim for Relief, for breach of contract. After setting forth the facts of the case, the Court will address the Defendant's Motion, which it shall overrule.

## I. Factual Background

For purposes of ruling on the Defendant's Motion, the Court will draw its facts from the Plaintiffs' Second Amended Complaint, which it shall assume to be true. It shall also construe in the Plaintiffs' favor all reasonable inferences which can be drawn from such facts.

The Plaintiffs in this case are the owners of several trademarks, including LEXIS, NEXIS, LEXIS–NEXIS, SHEPARD'S, SHEPARDIZE, MATTHEW BENDER and MARTINDALE–HUBBELL, all names and marks familiar to those who work in the legal profession.[2] These marks represent a variety of proprietary legal research and information products and services, available in hard copy, software and online formats alike.

---

1. Document No. 42 is the Defendant's Motion to Dismiss directed toward the Plaintiff's First Amended Complaint (Doc. # 17). That Motion was mooted by the filing of the Second Amended Complaint (Doc. # 47). However, the substance of the first Motion was incorporated by reference into the Motion to Dismiss which is now under consideration (Doc. # 48). Thus, while the Court shall overrule the Motion docketed as Document No. 42, as moot, it will reference it herein to the extent it contains the substance of the relevant arguments incorporated into the Motion docketed as Document No. 48.

2. The Plaintiffs are all subsidiaries of the same corporate parent. (*See* Corporate Disclosure Statements (Doc. # s 2, 3, 4 & 5).)

With respect to many of the Plaintiffs' products and services, The West Group ("West"), a division of the Thompson Corporation, is their major market competitor. The Defendant is a relatively small and privately held company which, like the Plaintiffs and West, offers online legal research products and services, accessible at its web site. Whereas the Plaintiffs and West have established themselves and their products and services within the legal profession over the course of several decades, the Defendant is a relative newcomer to the field.

MARTINDALE–HUBBELL is well known in the legal profession as a comprehensive database of names of lawyers and law firms, and information pertinent thereto. At some point, the Defendant entered into a license agreement with the Plaintiffs for the use of their MARTINDALE–HUBBELL database. The Defendant used this database, on more than one of its computers, to gather names and e-mail addresses of the lawyers listed therein. With these names and e-mail addresses, and in an effort to advertise, and attract users to, its products and services, the Defendant initiated an unsolicited mass e-mail campaign, directed toward customers of the Plaintiffs, comparing the costs and features of its products and services with those offered by the Plaintiffs. In such e-mails, the Defendant has represented that its searchable case law database is the third largest of its kind, behind those of the Plaintiffs and West. It has also represented that its database is more current than those of the Plaintiffs and West.

On its web site, the Defendant posted a chart comparing the products and services which it offered to those offered by the Plaintiffs and West. In making this comparison, the Defendant referred to the Plaintiffs and West collectively as "Wexis," and listed all of the information offered by the Plaintiffs and West which it also of-fered or offers. In addition, at other places on its web site, and in e-mail correspondence to the Plaintiffs' customers, the Defendant stated that, together, the Plaintiffs and West, referred to collectively as "Wexis," constituted a "duopoly" in the legal research and information field. The Defendant also used several of the Plaintiffs' marks in a variety of fashions on its web site to illustrate the features of its own products and services and to distinguish them from the products and services offered by the Plaintiffs. One such example of the Defendant's use of the Plaintiffs' marks is its use of the trademark SHEPARD'S. SHEPARD'S is a legal research service which, in its basic form, allows a researcher to check the current validity of a case citation (i.e., check to see if the cited case still constitutes "good law"). On its web site, the Defendants made available a number of hyperlinks to other products and services available on the Internet, law-related and non-law-related alike. One such link it provided at the time this suit was filed was to SHEPARD'S. The use of this link was not authorized by the Plaintiffs.

The Defendant offers only a limited amount of proprietary information; the bulk of the information it provides is made available to a user by linking him or her to web sites maintained by the Plaintiffs and others. Thus, when a user conducts a legal research session via the Defendant's web site, the ultimate source of the information gathered in the search is often a product or service developed and maintained by the Plaintiffs (or other entities). The Defendant does not conceal this fact from its users, which is to say, users are made aware of the fact that the information they are receiving is being provided by a source other than the Defendant. However, the Defendant's software places a frame around the online screen which the user views, and in that screen it places

its name before the name of the entity actually providing the requested information, separated by a dash, with the proprietary entity's name in brackets. So, for example, if a user's research requires a link to the Plaintiffs' web site which offers the SHEPARD'S service, in the upper leff-hand corner of the frame surrounding the user's screen, the name "TheLaw.net— [Matthew Bender—Shepard's Citations]" would appear. The Defendant also makes available certain information from one of the Plaintiffs' proprietary web sites, www.bender.com, from which the Plaintiffs would typically derive revenue. By making this information available at its own web site, the Defendant denies the Plaintiffs the ability to realize revenue from the production of same.

At times, the Defendant has advertised in unsolicited e-mails to the Plaintiffs' customers that its products and services are current and up-to-date when in fact they have not been.

## II. *Analysis*

Pursuant to Rule 12(b)(6), the Court may only consider the facts as pled in the Complaint in deciding whether the Plaintiff has stated a valid claim. *See Nelson v. Miller*, 170 F.3d 641, 649 (6th Cir.1999). "Where actionable facts are alleged, the Court must not assess the merits of the cause or the probability of success, which are matters unrelated to the sufficiency of the complaint." *McDaniel v. Rhodes*, 512 F.Supp. 117, 120 (S.D.Ohio 1981). "A court should not dismiss a plaintiff's complaint under Rule 12(b)(6) unless, after construing the complaint in the light most favorable to the plaintiff and accepting all factual allegations as true, the court determines that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Nelson*, 170 F.3d at 649 (citation omitted); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In ruling on the Defendant's Motion in this case, the Court will first consider the theory which it sets forth in urging the Court to sustain same. The Court will then consider the merits of its Motion as it relates to the claims raised by the Plaintiffs in their Second Amended Complaint.

### A. *Defendant's Theory Underlying its Motion to Dismiss*

The Defendant's argument, in moving for dismissal under Rule 12(b)(6), is an uncommon one. The question presented for purposes of ruling on its Rule 12(b)(6) motion is whether the Plaintiffs have alleged facts which, when construed in their favor, satisfy the recognized elements of their various claims for relief. Stated in the language of the governing rule, the question is whether they have "stated a claim upon which relief can be granted." With one exception, relating to the Plaintiffs' tortious interference claim (Ninth Claim for Relief), the Defendant does not contend that the allegations in the Second Amended Complaint do not state facts which, in theory, can be construed to meet the elements of each claim for relief. Instead, it focuses on the second part of the Rule 12(b)(6) standard, to wit: "upon which relief can be granted." In short, its argument, with the exception of the tortious interference claim, is that even if the pleadings meet the technical requirements for stating the various claims for relief, the Plaintiffs cannot prevail on the merits of said claims. Picking up on this, the Plaintiffs argue that the Defendant's Motion asks the Court to go beyond what it may consider under Rule 12(b)(6). They contend that the Defendant's Motion is not aimed at challenging the sufficiency of their allegations, but is, rather, aimed at challenging the merits of otherwise well-pled claims for relief, stating "Defendant's Motion is frivolous. Defendant's motion reveals a shocking lack of understanding of

or utter disregard for the purpose and standard for a motion to dismiss for failure to state a claim under 12(b)(6) of the Federal Rules of Civil Procedure. Defendant cites no authority for the proposition that Plaintiffs fail to state a claim, but rather attempts to use its·motion to argue the merits of the case." (Doc. # 49 at 1–2.)

■ The Court disagrees with the Plaintiffs that the Defendant's attempt to prevail on eight of the nine claims for relief implicated in its Rule 12(b)(6) Motion is frivolous or shocking, or demonstrates an "utter disregard" for the purpose of such a motion. The truth of the matter is that, with the exception of the tortious interference claim, which it contends is not well pled, the Defendant has submitted what amounts to an argument for judgment on the pleadings, an argument which is permitted under Rule 12(c) of the Federal Rules of Civil Procedure. These rules serve similar ends, insofar as they are dispositive motions, but at their cores they have distinct purposes. Rule 12(b)(6) is concerned with the technical sufficiency of the allegations in the complaint: under any reasonable construction of the facts, as pled, is there a recognized legal basis for granting the plaintiff the relief he seeks? In the Rule 12(b)(6) context, the merits of the claim are not supposed to be considered.[3] Rule 12(c), in contrast, *is* concerned with the merits: accepting ·the truth of the allegations and assuming *arguendo* that the plaintiff has stated a technically valid claim, is the defendant never-theless entitled to judgment on the merits? *See, generally,* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §§ 1367, 1368 & 1369 (2d ed.1990); *see also Paskvan v. City of Cleveland Civil Serv. Comm'n,* 946 F.2d 1233, 1235 (6th Cir.1991) ("The [Rule 12(c)] motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law."). As noted by Professors Wright and Miller: "The granting of a Rule 12(b) motion merely means that plaintiff has failed to satisfy one of the procedural pre-requisites for asserting his claim for relief. A motion for judgment on the pleadings, however, theoretically is directed towards a determination of the substantive merits of the controversy. . . ." 5A Wright & Miller, § 1369, at 532–33.

■ The difference between the two types of motions stems from when in the course of proceedings they can be raised. Motions brought under Rule 12(b)(6), indeed, under 12(b) generally, must be brought by a defendant "before pleading" (i.e., before filing its answer to the complaint). Motions brought under Rule 12(c) cannot be filed until "[a]fter the pleadings are closed" (i.e., after filing its answer). Still and all, the standard for reviewing Rule 12(c) motions is often identical to that used for reviewing Rule 12(b)(6) motions, given that Rule 12(c) can be invoked in a number of situations where a Rule 12(b) motion could have been, but was not, filed by the defendant. *See* Rule 12(h)(2) & (3);

---

**3.** Be that as it may, it is recognized that certain affirmative defenses, such as privileges, immunities, failure to exhaust administrative remedies, and statutes of limitation and the like, can be raised in Rule 12(b)(6) motions, where it is clear on the face of the complaint that the affirmative defense is valid. *See e.g., Levin v. Childers,* 101 F.3d 44, 48 (6th Cir.1996) (qualified immunity in a case arising under 42 U.S.C. § 1983 properly raised on 12(b)(6) motion); *Dixon v. Alexan-* der, 741 F.2d 121, 122 (6th Cir.1984) (failure to exhaust administrative remedies properly raised in a 12(b)(6) motion); *Gibson v. American Bankers Ins. Co.,* 289 F.3d 943, 946 (6th Cir.2002) (statute of limitations properly raised on 12(b)(6) motion). Accordingly, while a court does not, technically speaking, reach the merits of the underlying dispute when it sustains a Rule 12(b)(6) motion on the basis of such defenses, the decision is "on the merits," in that it is dispositive of the claim.

5A Wright & Miller § 1368, at 514–17. Thus, often times, after a responsive pleading has been filed, a defendant will move to dismiss for failure to state a claim under Rule 12(c), even though there may be no need to refer to the responsive pleading, such that it would have been proper to move for dismissal under Rule 12(b)(6). In such an instance, it is proper to treat the motion in the manner as one brought pursuant to Rule 12(b)(6). *See id.*, at 515. Moreover, where the pleadings are closed but a defendant mistakenly moves to dismiss under Rule 12(b)(6), instead of Rule 12(c), the Sixth Circuit has held that "where the substance of the motion is plain," it is proper to treat a motion styled as one under Rule 12(b)(6) as if it were brought under Rule 12(c). *See Wagner v. Higgins,* 754 F.2d 186, 188 (6th Cir.1985).

Without expressly stating as much, the Defendant's own argument demonstrates that its Motion is more akin to one brought under Rule 12(c) than Rule 12(b)(6).

[T]his Court can take judicial notice of the relevant customer base for the Plaintiffs' products and that of TLN. As the [Second Amended Complaint] alleges, all of the parties are selling either goods or services that are used for legal research. If there is one area about which this Court should be able to take notice, it is the nature of the marketplace for these particular goods and services. Not only is the Court engaged in using the goods and services on a daily basis, all the parties which appear before the Court and provide the Court with written submissions are consumers of the products of the parties. The Court is a consumer and has constant contact with those who are also consumers of the good and services at issue. The Court has first hand knowledge of the ways that the product offerings from the various vendors work, how they are different from other similar products and how the vendors go about establishing that differentiation. This Court is not required to ignore what it knows. (Doc. # 42 at 13–14.) The Defendant's point is that this Court can utilize its institutional knowledge of the products and services at issue in this case, and rule on the merits of the Plaintiffs' claims without resort to additional fact finding. For that reason, it argues that Rule 12(b)(6) provides a satisfactory means for disposing of the bulk of this case. "In short, thelaw.net asserts that even if Plaintiffs factual assertions are true, the facts complained of do not rise to the level of actionable claims. Thus, thelaw.net's Motion is not in the nature of the 'did not—did too' factual debate as Plaintiffs seek to characterize it, but is in the nature of a demurrer." (Reply (Doc. # 52) at 1.) The Plaintiffs, of course, object to the use of Rule 12(b)(6), the rule actually invoked by the Defendant, in the manner contemplated by the Defendant.

As Professors Wright and Miller point out in their noted treatise on practice and procedure, a general demurrer at common law could be used to contest the sufficiency of a complaint, "or it could be employed to resolve the substantive merits of the controversy." 5A Wright & Miller, § 1367 at 509. The first usage is now embodied in Rule 12(b)(6), while Rule 12(c) embodies both the first and second usages of the common law demurrer. *See id.* § 1355, at 291–94 & § 1367, at 509. With the exception of its argument relating to the Plaintiffs' Ninth Claim for Relief, for tortious interference with a business relationship, the obvious, stated purpose of the Defendant's Rule 12(b)(6) Motion at issue herein is "to resolve the substantive merits of the controversy," which is in the nature of the second usage of a common law demurrer, and thus in the nature of a motion brought pursuant to Rule 12(c). The distinction is a fine one, but the facts of this case and

the form of the argument raised by the Defendant illustrate the differences of the two rules.

Having made these observations, the Court will proceed to address the Defendant's argument as it relates to the Plaintiffs' claim for tortious interference with a business relationship, pleaded as their Ninth Claim for Relief. Following that discussion, the Court will address the Defendant's argument as it relates to the remainder of the claims implicated by its Motion (First through Eighth Claims for Relief).

### B. *Tortious Interference with a Business Relationship*

In Ohio, "[t]he elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Barilla v. Patella,* 144 Ohio App.3d 524, 760 N.E.2d 898, 904 (2001) (citation omitted). As with a cause of action for tortious interference with a contract, interference with a business relationship is only tortious if there exists no privilege to engage in the activity of which the plaintiff complains. *See id.* Unlike a claim for tortious interference with a contract, however, the Plaintiffs need not submit proof of a contractual relationship. *Super Sulky, Inc. v. United States Trotting Ass'n.,* 174 F.3d 733, 741 (6th Cir.), *cert. denied,* 528 U.S. 871, 120 S.Ct. 172, 145 L.Ed.2d 146 (1999).

The Defendant argues that the Plaintiffs have failed to allege facts sufficient to support a finding of elements (2) and (4), as set forth in *Barilla.* More specifically, it argues that the allegations do not support a finding that it was aware of a "business relationship" between any of the Plaintiffs and others. It also argues that because it

is an obvious competitor of the Plaintiffs, any act of interference that it did commit was privileged. *See Fred Siegel Co., L.P.A. v. Arter & Hadden,* 85 Ohio St.3d 171, 707 N.E.2d 853, 858 (1999); Restatement (Second) of Torts §§ 767 & 768 (1979). The Court disagrees, and finds that the Defendant has taken a far too restrictive view of what is required under our system of notice pleading. Rule 8(a) requires that a plaintiff make only "a short and plain statement of the claim showing that the pleader is entitled to relief," and the Supreme Court has consistently admonished the district courts about imposing heightened pleading requirements. *See, e.g., Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

In their Ninth Claim for Relief, the Plaintiffs allege the following:

> Defendant has deliberately interfered with Plaintiffs' relations with their customers, causing harm to Plaintiffs. Through its false advertising and other activities, including its improper use of Plaintiffs' MARTINDALE–HUBBELL® database, Defendant has engaged in activities intended to result and, upon information and belief, resulting in Plaintiffs' customers diverting their business relations from Plaintiffs to Defendant, and Plaintiffs losing revenue, and unless Defendant is enjoined from continuing these wrongful acts, the harm to Plaintiffs will increase.

(Second Amended Complaint ¶ 125.) This more than adequately states a claim for tortious interference with a business relationship. Because it is not obvious on the face of the Second Amended Complaint that the Defendant was unaware of any such business relationship, or was privi-

leged to interfere therewith, it cannot be said that under any set of facts the Plaintiffs would not be entitled to relief. Therefore, dismissal under Rule 12(b)(6) would be inappropriate.

### C. *Overview of the Plaintiffs' Remaining Claims*

With respect to the Plaintiffs First through Eighth Claims for Relief, the Defendant, as noted, does not dispute the sufficiency of the allegations; rather, it disputes their merits. These eight claims can be grouped into three general categories. The First, Fourth and Sixth Claims for Relief all allege trademark infringement, under the Lanham Act, 15 U.S.C. §§ 1114(1) & 1125(a)(1)(A), Ohio Rev.Code § 1329.65 and the common law of Ohio, respectively. The Second, Fifth and Seventh Claims for Relief all allege some form of false advertising, unfair competition or unfair trade practice, under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), Ohio Rev. Code § 4165.02 and common law of Ohio, respectively. Finally, the Third and Eighth Claims for Relief allege trademark dilution, under the Lanham Act, 15 U.S.C. § 1125(c), and the common law of Ohio, respectively.

In general, "trademark law now pursues two related goals—the prevention of deception and consumer confusion, and, more fundamentally, the protection of property interests in trademarks." *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir.1987). "As a means of achieving these goals, the common law has developed a number of types of infringement actions." *Id.* The Court will now briefly discuss the distinct theories underlying the Plaintiffs' three categories of claims.

### 1. *Trademark Infringement Claims*

The Sixth Circuit has noted the following regarding claims for trademark infringement:

The first and most common is "palming off." This occurs between directly competing goods and the confusion is over their source of origin. Similar marks on these goods can cause the consumer to mistakenly buy the infringing defendant's product as the plaintiff's; the defendant tries to "palm off" his goods as the plaintiff's. *See, e.g., Seven–Up Co. v. Get Up Corp.*, 340 F.2d 954 (6th Cir.), *cert. denied,* 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965). A second kind of infringement is confusion of sponsorship, which occurs where the goods do not directly compete. In this situation, the goods are unrelated enough that no inference arises that they originated from the same source, but the similarity of the trademarks erroneously suggests a connection between the sources; the defendant seeks to capitalize on the plaintiff's goodwill and established reputation. *See, e.g., Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir.1985) (ordinary consumer might well believe defendant restaurant was affiliated with owners of fictional character "Conan The Barbarian" through licensing).

*Id.*

▮▮▮ In a case such as the one at bar, a claim for trademark infringement will lie under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), if the Plaintiffs can demonstrate (1) that they own valid, registered trademarks in connection with specific products or services, (2) their continuous use of the marks, and (3) a likelihood of confusion among consumers due to the contemporaneous use of their marks by the Defendant in connection with similar products or services. *See Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991). Trademark claims brought under Ohio Rev.Code 1329.65 or the common law

of Ohio are generally analyzed under the same framework. *See Rock and Roll Hall of Fame and Museum Inc. v. Gentile Productions,* 934 F.Supp. 868, 872 (N.D.Ohio 1996), *vacated on other grounds by* 134 F.3d 749 (6th Cir.1998); *see also Coca–Cola Co. v. Procter & Gamble Co.,* 822 F.2d 28, 29 (6th Cir.1987) (noting that the Lanham Act "leaves to the state courts, administering the state laws, and to the diversity cases, those cases for common law trade-mark infringement that do *not* arise out of deceptive and misleading use of such marks in interstate and foreign commerce"). The key inquiry is whether there is a likelihood for confusion between competing uses of the same or similar mark, which requires an examination of the following eight factors: (1) the strength of the senior mark; (2) the relatedness of the goods or services; (3) the similarity of the marks; (4) the evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) the likelihood of expansion of the respective product lines. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,* 109 F.3d 275, 280 (6th Cir.1997).

In their Second Amended Complaint, the Plaintiffs have alleged that they are the owners of several registered trademarks, that they have been using their marks continuously since they were first used in commerce, and that the Defendant has appropriated and used said marks on its own web site and in unsolicited e-mails to their customers in a manner that confuses or is likely to confuse consumers as to the source and sponsorship of the marks, by suggesting an association between themselves and the Defendant, or between themselves and West, their primary competitor.

2. *Unfair Competition, Deceptive Trade Practices and False Advertising Claims*

■ Regarding their claims for unfair competition under the § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and deceptive trade practices under Ohio Rev.Code § 4165.02 and the common law of Ohio, as with trademark infringement claims, these types of claims turn on "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music,* 109 F.3d at 280, 288. Unlike claims brought under § 32(1) of the Lanham Act or Ohio Rev.Code § 1329.65, such claims will lie without regard to whether the disputed marks are registered. False advertising claims under the § 43(a) Lanham Act and Ohio Rev.Code § 4165.02 require a showing that (1) the defendant has made false or misleading statements of fact concerning his own product or another's; (2) the statement deceives or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff. *See American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.,* 185 F.3d 606, 613 (6th Cir.1999); *Cesare v. Work,* 36 Ohio App.3d 26, 520 N.E.2d 586, 590 (1987) (noting that federal standards apply to claims brought under Ohio law).

As they do with their trademark infringement claims, the Plaintiffs allege, under their claims for unfair competition and deceptive trade practices, that the Defendant has misappropriated and misused their distinctive marks in such a way as to

confuse consumers as to the source and sponsorship of their marks. They have also alleged that the Defendant has made certain false statements or misrepresentations about its own products and services or about their products and services, and that such false statements or misrepresentations have and will result in harm to them.

### 3. *Trademark Dilution Claims*

 Regarding their trademark dilution claims, such claims, unlike trademark infringement claims and deceptive trade practices or unfair competition claims, are not tied to consumer confusion, *see Ameritech,* 811 F.2d at 965, and they do not require a showing that the Defendant used identical marks. *See Moseley v. V. Secret Catalogue, Inc.,* 537 U.S. 418, 123 S.Ct. 1115, 1123, 1124, 155 L.Ed.2d 1 (2003). Under a dilution theory, the holder of a distinctive mark seeks to protect its interests in the trademark from the use of an identical *or* similar mark by a junior user that tends to blur or tarnish the image of the distinctive mark. *See id.* at 1123. "Dilution occurs when the senior user possesses a distinctive mark, the junior use of which might not, in the short run, result in loss of sales or loss of control over reputation, but might cause a gradual diminution in the mark's distinctiveness, effectiveness and, hence, value. This kind of infringement corrodes the senior user's interest in the trademark by blurring its product identification or by damaging positive associations that have attached to it." *Ameritech,* 811 F.2d at 965. Under § 43(c)(1) of the Lanham Act, 15 U.S.C. § 1125(c)(1), to make out a claim for trademark dilution, a plaintiff must demonstrate the following: (1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) the junior use must begin after the senior mark has become famous; and (5) the junior use must cause dilution of the distinctive quality of the senior mark. *See Kellogg Co. v. Exxon Corp.,* 209 F.3d 562, 577 (6th Cir.), *cert. denied,* 531 U.S. 944, 121 S.Ct. 340, 148 L.Ed.2d 273 (2000). Ohio courts recognize the same cause of action under the State's common law. *See Ameritech,* 811 F.2d at 965.

The Plaintiffs' dilution claims are premised on the theory that the Defendant's use of their trademarks on its web site and e-mails and the like, and its use of the term "Wexis," will dilute and blur and distinctive quality of their marks, and that its use of the term "duopoly," or "Wexis duopoly," will wrongly imply an anti-competitive association between them and their competitor West. (Second Amended Complaint ¶¶ 99–103, 123.)

### D. *Whether Remaining Claims Can be Dismissed*

As stated earlier, with regard to the claims set forth in the Plaintiffs' First through Eighth Claims for Relief, the Defendant does not contend that the pleadings do not state claims sufficient to satisfy Rule 8(a), but instead asks this Court to rule on the basis of its own institutional knowledge of the subject matter at issue that these claims lack merit. The cornerstone of its argument is that the Court, as a consumer of the legal products and services at issue in this case, can determine at this stage of the litigation whether the typical consumer of these products and services would be confused as to the source or sponsorship of the marks in question. Because, according to the Defendant, the Court should find that the typical consumer, i.e., an attorney or other legal professional, would not be so confused, after consideration has been given to the relevant factors which bear on the analysis, it should rule pursuant to Rule 12(b)(6) that the Plaintiffs have failed to state claims, for trademark infringement

or unfair competition and deceptive trade practices, upon which relief can be granted. At the very least, it argues that the Court should rule that relief cannot be granted because any uses which it has made or does make of the marks in dispute were or are allowable under the "fair use" doctrine. *See* 15 U.S.C. § 1115(b)(4) (making it a defense to a claim for infringement "that the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin").

Furthermore, the Defendant argues that the Court can determine that the term "Wexis" is not a registered mark, or an unregistered mark that is otherwise used by the Plaintiffs, that the term is commonly used in public as a shorthand reference to the Plaintiffs and West, and that its own use of that term in no way denigrates, tarnishes or harms the Plaintiffs or connotes an association between them and West. Similarly, it argues that its references to the Plaintiffs and West as a duopoly in the legal research products and services market, or any references to the "Wexis duopoly," is equally innocuous, and not likely to create any confusion on the part of the typical consumers or the Plaintiffs' products and services, and not likely to tarnish or otherwise harm same. Finally, it argues that the Court can determine for itself, at this stage of the litigation, that any claims it has made which the Plaintiffs have alleged to be false or misleading are, in fact, not false or misleading, and at most constitute puffiing.

■ Having adequately pled facts supporting dilution claims, at least in theory, the Plaintiffs deserve an opportunity to support their claims with additional facts procured through the discovery process. The Court understands the Defendant's legal position, but disagrees with it that it would be impossible for the Plaintiffs to make out a case on the claims it has raised in its Second Amended Complaint. Furthermore, the same would be true even had the Defendant already filed its Answer to the Second Amended Complaint, such that the Court could actually consider the merits under a Rule 12(c) analysis. Because it is not beyond reason that the Plaintiffs might be able to demonstrate that their consumer base is greater than that of mere attorneys, judicial officers and other legal professionals, or, regardless of the demographics of their consumer base, that they might be able to demonstrate how consumers might actually be confused by the Defendant's alleged use of their marks, the Defendant's arguments are better raised in a Motion for Summary Judgment.

However, though they are no doubt entitled to an opportunity to make their case on the merits, the Court will note with respect to dilution claims that it is extremely difficult to prevail on such under the Lanham Act. As the Supreme Court has only recently held, the text of the statute "unambiguously requires a showing of actual dilution, rather than a likelihood of dilution." *Moseley*, 123 S.Ct. at 1124.

[M]ental association will not necessarily reduce the capacity of the famous mark to identify the goods of its owner, the statutory requirement for dilution under the FTDA. For even though Utah drivers may be reminded of the circus when they see a license plate referring to the "greatest *snow* on earth," it by no means follows that they will associate "the greatest show on earth" with skiing or snow sports, or associate it less strongly or exclusively with the circus. "Blurring" is not a necessary conse-

quence of mental association. (Nor, for that matter, is "tarnishing.")

*Id.* at 1124–25.

The Court will raise one final point. The Defendant has noted that much about which the Plaintiffs complain in their Second Amended Complaint is now moot, as the Defendant has removed many of its references to the Plaintiffs' marks on its web site. This fact directly bears on the Plaintiffs' request for injunctive relief. (*See* Second Amended Complaint, Prayer for Relief, § VI(A)(1)-(12).) It does not affect their standing to pursue this cause of action, given their request for damages, but it is an issue the implications of which the parties may choose to address in more detail in relation to any motions for summary judgment which may be submitted at a subsequent time.

III. *Conclusion*

For the reasons given, the Defendant's Motion to Dismiss under Rule 12(b)(6) (Doc. # 48) is OVERRULED. The Court agrees with the Plaintiffs that a defendant may not make a motion for judgment on the merits pursuant to Rule 12(b)(6), and that, in any event, fact issues remain which cannot be ruled upon until the Plaintiffs have had the opportunity to conduct discovery. Accordingly, the Court finds that the Defendant's argument, though logical, is one that would be better made pursuant to a motion for summary judgment under Rule 56.

Counsel of record will take note that a telephone conference call will be held at 8:30 a.m., Eastern Time, on Tuesday, April 8, 2003, to determine the viability of the June 2, 2003, trial date.